# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

HECTOR MIGUEL GONZALEZ,

     Petitioner

v.

BRIAN WILLIAMS, et al.,

     Respondents.

Case No.: 2:15-cv-00618-RFB-DJA

**Order**

     This case is a petition for writ of habeas corpus, pursuant to 28 U.S.C. § 2254, by Hector Miguel Gonzalez, a Nevada prisoner. This case is before the Court for adjudication of the merits of Gonzalez's remaining grounds for relief. The Court denies Gonzalez's petition, denies a certificate of appealability, and directs the Clerk of the Court to enter judgment accordingly.

## I.    BACKGROUND

     Gonzalez's convictions are the result of events that occurred on January 21, 2009, in Clark County, Nevada. (ECF No. 14-7). In its order affirming Gonzalez's convictions, the Nevada Supreme Court described the crimes, as revealed by the evidence at Gonzalez's trial, as follows:

> Hector Gonzalez broke into the house where his wife Ana Gonzalez lived, and attacked Ana and his sister-in-law Elsie Serpas with a knife. Hector stabbed Ana in the neck and Elsie in the hand. He threatened more violence if they called the police but later allowed Elsie to call 911, telling her to only ask for an ambulance, not the police. After Elsie called 911, Hector stayed at the scene until the police responded. At the time of the attack, Ana had an extended protective order against Hector.

(ECF No. 16-5).

     On May 7, 2010, a jury convicted Gonzalez of count 2: burglary while in possession of a deadly weapon in violation of a court order; count 4: battery constituting domestic violence with

the use of a deadly weapon resulting in substantial bodily harm while in violation of a court order; count 5: battery constituting domestic violence with the use of a deadly weapon in violation of a court order; count 6: coercion with the use of a deadly weapon in violation of a court order; and count 8: preventing or dissuading a victim or witness from reporting a crime, commencing a prosecution, or causing an arrest. (ECF No. 15-5.) The state district court sentenced Gonzalez as follows: count 2: 26 to 120 months, with a consecutive term of 12 to 60 months for the deadly weapon enhancement; count 4: 48 to 120 months, with a consecutive term of 12 to 60 months for the deadly weapon enhancement, concurrent with count 2; count 5: 24 to 72 months, with a consecutive term of 12 to 60 months for the deadly weapon enhancement, consecutive to count 4; count 6: 12 to 48 months, with a consecutive term of 12 to 48 months for the deadly weapon enhancement, concurrent with count 5; and count 8: 12 to 38 months, concurrent with count 5. (ECF No. 16-3). The Nevada Supreme Court affirmed Gonzalez's convictions on February 24, 2012. (ECF No. 16-5).

Gonzalez filed a petition for a writ of habeas corpus (post-conviction) in state district court. (ECF No. 16-7). Gonzalez's counsel filed a supplemental points and authorities in support of the petition. (ECF No. 16-9). An evidentiary hearing was held on Gonzalez's petition. (ECF No. 16-13). The state district court denied the petition. (ECF No. 16-14.) The Nevada Supreme Court affirmed the denial of Gonzalez's petition. (ECF No. 16-17.)

Gonzalez dispatched his federal habeas petition for filing on or about April 1, 2015. (ECF No. 10). Gonzalez's petition asserts that his federal constitutional rights were violated due to the following alleged violations:

1. The state district court failed to bifurcate the proceedings.
2. Double jeopardy and redundancy principles prohibit his multiple convictions arising from a single course of conduct.
3. The state district court erred by admitting hearsay evidence.

1        4.       The State committed misconduct during closing argument.

        5.       The state district court erred by refusing to proffer a "reverse flight"

2                  instruction.

        6.       There was insufficient evidence to convict him.

3        7.       There were cumulative errors.

        8.       His trial counsel was ineffective:

4                  a.      His trial counsel failed to do necessary investigations and to consult necessary experts.

5                  b.      His trial counsel failed to file numerous pretrial motions.

                  c.      His trial counsel failed to file a motion to dismiss the

6                          indictment when the State violated *Marcum*.

                  d.      His trial counsel failed to file a motion to bifurcate the

7                          sentence enhancement.

                  e.      His trial counsel failed to file a motion in limine to exclude

8                          bad act evidence.

                  f.      His trial counsel failed to file a motion challenging the

9                          voluntariness of his statement.

                  g.      His trial counsel failed to file a motion for psychiatric

10                        examination of the victim.

        9.       His trial counsel failed to object to prosecutorial misconduct.

11        10.     There were cumulative errors.

12   Id. The Respondents filed a motion to dismiss Gonzalez's petition. (ECF No. 13). Gonzalez filed

13  a response. (ECF No. 19). On March 31, 2017, this Court granted the Respondents' motion to

14  dismiss in part: it found that Grounds 5 and 9 were unexhausted and Grounds 3 and 10 were

15  dismissed. (ECF No. 20.). This court also granted Gonzalez's previous request for the appointment

16  of counsel. Id. Gonzalez abandoned Grounds 5 and 9. (ECF No. 22). The Respondents filed an

17  answer to Gonzalez's petition on August 22, 2017. (ECF No. 25). Gonzalez filed a reply on March

18  20, 2018. (ECF No. 32).

19  **II.   STANDARD OF REVIEW**

20       28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas

21  corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

22       An application for a writ of habeas corpus on behalf of a person in custody pursuant
         to the judgment of a State court shall not be granted with respect to any claim that

23       was adjudicated on the merits in State court proceedings unless the adjudication of
         the claim --

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." Lockyer v. Andrade, 538 U.S. 63, 73 (2003) (quoting Williams v. Taylor, 529 U.S. 362, 405-06 (2000), and citing Bell v. Cone, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 75 (quoting Williams, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous.  The state court's application of clearly established law must be objectively unreasonable." Id. (quoting Williams, 529 U.S. at 409-10) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. at 102 (citing Lockyer, 538 U.S. at 75); see also Cullen v. Pinholster, 563 U.S. 170, 181 (2011)

1 (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating
2 state-court rulings, which demands that state-court decisions be given the benefit of the doubt"
3 (internal quotation marks and citations omitted)).

4 **III.   DISCUSSION**

5     **A.   Ground 1**

6     In Ground 1, Gonzalez claims that his federal constitutional rights were violated when the
7 state district court failed to bifurcate the sentencing enhancement issue, or, alternatively, failed to
8 give a limiting instruction. (ECF No. 10 at 3, 7.) Specifically, Gonzalez asserts that the admission
9 of the extended protective order allowed the jury to infer that he engaged in prior criminal
10 activities. Id. at 3-4. Gonzalez explains that the jurors should have been asked to return verdicts
11 on the underlying charges before adjudicating the issue of whether he committed the offenses in
12 violation of a court order. Id. at 5. In addition to allowing the jury to infer that he had a propensity
13 towards violence, Gonzalez argues that the extended protective order also allowed the jury to infer
14 that he had a drinking problem, as it mandated that when the children were in his care, no alcohol
15 was to be consumed. (ECF No. 32 at 18). The Respondents argue that the protective order was not
16 admitted to prove Gonzalez's character; rather, it was evidence that helped prove an element of
17 the charged offenses. (ECF No. 25 at 7).

18     On Gonzalez's direct appeal, the Nevada Supreme Court held:

19     Because Hector failed to request that the district court bifurcate the sentence
20 enhancement for violation of a court order, he failed to preserve this issue for
appellate review. See Leonard v. State, 117 Nev. 53, 63, 17 P.3d 397, 403 (2001).
We review unpreserved issues for plain error. Id. Under a plain error review, we
21 will "consider whether error exists, if the error was plain or clear, and if the error
affected the defendant's substantial rights." Calvin v. State, 122 Nev. 1178, 1184,
22 147 P.3d 1097, 1101 (2006). The defendant must show actual prejudice. Id.

23     Hector is unable to show actual prejudice by the district court's failure to
sua sponte bifurcate the proceedings. Hector argues that the protective order creates

an inference that he has committed some prior unspecified act of criminal misconduct. However, an inference is not enough to show actual prejudice. The evidence of the protective order was offered to help prove an element of six of Hector's eight charged offenses, and the State has to prove each element of each offense. Thus, the district court's decision not to bifurcate the proceedings does not amount to plain error. [Footnote 2: Hector also contends that the district court should have provided a limiting instruction when admitting the protective order. However, the protective order was not admitted to prove Hector's character, but rather to prove an element of the charges against him. Thus, the district court did not err in failing to provide a limiting instruction. See Mclellan v. State, 124 Nev. 263, 269, 182 P.3d 106, 110 (2008)].

(ECF No. 16-5).

Gonzalez's wife, Ana Gonzalez, filed for a temporary protective order from Gonzalez. (ECF No. 33-4). The temporary protective order was granted by the District Court, Family Division, Clark County, Nevada on December 29, 2008. Id. The order was later extended until January 14, 2010. Id. The temporary protective order and the extended protective order were admitted at Gonzalez's trial. See id.

Contrary to Gonzalez's assertions, bifurcated trials "have never been compelled by th[e] Supreme Court] as a matter of constitutional law." Spencer v. Texas, 385 U.S. 554, 568 (1967) ("Two-part jury trials are rare in our jurisprudence."). Moreover, "[u]nder AEDPA, even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not permit the grant of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme Court." Yarborough, 568 F.3d at 1101 (citing 28 U.S.C. § 2254(d)); see also Dowling v. United States, 493 U.S. 342, 352 (1990) (explaining that the Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly"). Importantly, the Supreme Court has declined to hold that evidence of other crimes or bad acts "so infused the trial with unfairness as to deny due process of law." Estelle v. McGuire, 502 U.S. 62, 75 n.5 (1991) (explaining that it "express[es] no opinion on whether a state law would violate the Due Process

Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime"); see also Alberni v. McDaniel, 458 F.3d 860, 866 (9th Cir. 2006) (concluding that the state court had not acted objectively unreasonably in determining that the propensity evidence introduced against the defendant did not violate his due process rights); Garceau v. Woodford, 275 F.3d 769, 774 (9th Cir. 2001), rev'd on other grounds, 538 U.S. 202 (2003) ("The Supreme Court has never expressly held that it violates due process to admit other crimes evidence for the purpose of showing conduct in conformity therewith."); Mejia v. Garcia, 534 F.3d 1036, 1047 (9th Cir. 2008) ("[T]he United States Supreme Court has never established the principle that introduction of evidence of uncharged offenses necessarily must offend due process.").

In order to support his argument that a limiting instruction should have been provided by the state district court, Gonzalez points to Spencer. Indeed, in Spencer, the Supreme Court held that it is not a violation of due process to admit other crimes evidence, for purposes other than to show conduct in conformity therewith, so long as the jury is given a limiting instruction "that it should not consider the prior conviction as any evidence of the defendant's guilt on the charge on which he was being tried." 385 U.S. at 563-64; see also Richardson v. Marsh, 481 U.S. 200, 207 (1987) (explaining that in Spencer the Supreme Court "held that evidence of the defendant's prior criminal convictions could be introduced for the purpose of sentence enhancement, so long as the jury was instructed it could not be used for purposes of determining guilt"). However, a temporary protective order is not a conviction. See Nev. Rev. Stat. § 33.020. Additionally, it is worth noting that the jury was instructed to determine whether Gonzalez violated the protective order only if they determined that he was guilty of count one, two, three, four, five and/or six. (ECF No. 15-4 at 31 ("If you find the Defendant guilty of count one, two, three, four, five and/or six, you must also determine whether or not the crimes alleged were committed after the Defendant had been

served with a temporary or extended order for protection against domestic violence issued by the

District Court, Family Division, of the State of Nevada, in and for the County of Clark, in Case

No. T08113976T, dated December 16, 2008.")).

Therefore, the Nevada Supreme Court's ruling was not contrary to, or an unreasonable

application of, clearly established federal law, as determined by the Supreme Court, and was not

based on an unreasonable determination of the facts in light of the evidence. See 28 U.S.C. §

2254(d). The Court will deny Gonzalez habeas corpus relief with respect to Ground 1.

### B.      Ground 2

In Ground 2, Gonzalez claims that his federal constitutional rights were violated when he

was convicted of multiple crimes arising from the same course of conduct in violation of the

Double Jeopardy Clause. (ECF No. 10 at 9). Gonzalez explains that two of his convictions,

coercion and dissuading a witness, were based on the same alleged conduct: threatening Elsie if

she called the police. Id. at 9, 10. Gonzalez also explains that he could not have committed one

offense, dissuading a witness, without committing the other offense, coercion. Id. at 10.

On Gonzalez's direct appeal, the Nevada Supreme Court held:

> The Double Jeopardy Clause of the Fifth Amendment prohibits multiple
> punishments for the same offense. U.S. Const. amend. V; Salazar v. State, 119 Nev.
> 224, 227, 70 P.3d 749, 751 (2003). Nevada utilizes the test set forth in Blockburger
> v. United States, 284 U.S. 299 (1932), to determine the constitutionality of multiple
> convictions for the same act or transaction. Salazar, 119 Nev. at 227, 70 P.3d at
> 751. Under Blockburger, "'if the elements of one offense are entirely included
> within the elements of a second offense, the first offense is a lesser included offense
> and the Double Jeopardy Clause prohibits a conviction for both offenses.'" Id.
> (quoting Williams v. State, 118 Nev. 536, 548, 50 P.3d 1116, 1124 (2002), cert.
> denied, 537 U.S. 1031 (2002)). "The general test for determining the existence of a
> lesser included offense is whether the offense in question 'cannot be committed
> without committing the lesser offense.'" McIntosh v. State, 113 Nev. 224, 226, 932
> P.2d 1072, 1073 (1997) (quoting Lisby v. State, 82 Nev. 183, 187, 414 P.2d 592,
> 594 (1966)).
> Convictions are redundant when "'a defendant is convicted of [multiple]
> offenses that, as charged, punish the exact same illegal act.'" Salazar, 119 Nev. at

228, 70 P.3d at 751 (quoting <u>State of Nevada v. Dist. Ct.</u>, 116 Nev. 127, 136, 994 P.2d 692, 698 (2000)). In determining if two convictions are redundant, this court must consider "whether the material or significant part of each charge is the same even if the offenses are not the same." <u>Id.</u> at 227-28, 70 P.3d at 751.

NRS 199.305 provides that a person commits the crime of preventing or dissuading a witness when, through intimidation or threats, he or she prevents, dissuades, or delays a victim of a crime, a person acting on behalf of a victim, or a witness from reporting a crime or possible crime. A person is guilty of coercion when, through the use of violence, through the use of threatened violence, or through depriving the person of any tool, implement, or clothing, he or she intentionally compels another to do or abstain from doing an act which another person has the right to do or abstain from doing. NRS 207.190.

Hector's convictions for dissuading a witness and coercion do not violate the Double Jeopardy Clause. Coercion is not a lesser offense of dissuading a witness because one can be guilty of coercion through depriving a "person of any tool, implement or clothing, or hinder[ing] the person in the use thereof," but such deprivation would not necessarily be enough to achieve the intimidation or threat necessary for a person to be guilty of dissuading a witness. <u>See</u> NRS 199.305; NRS 207.190(1)(b). Dissuading a witness is not a lesser offense of coercion because a person can be guilty of dissuading a witness by delaying the person from action; whereas, for a person to be guilty of coercion, he or she must intentionally compel another to act or to abstain from acting, not just delay the person from acting. <u>See</u> NRS 199.305; NRS 207.190. As an individual can commit either crime without committing the other, neither is a lesser included offense of the other.

It is not clear whether the two charges stem from one single act of threatening Elsie or if they stem from more than one threat or act of intimidation. The jury could have found that Hector intentionally threatened Elsie so that she would not call the police but also threatened Elsie with the hope that it would delay her reporting the crime. This is especially plausible since he originally would not allow her to call 911 and then allowed her to call 911 but told her to ask for only the paramedics and not the police. However, if the same conduct is the basis for the conviction it does not mean that the convictions are redundant. <u>Salazar</u>, 119 Nev. at 227, 70 P.3d at 751. Here, the two convictions are not redundant as there is no evidence that the Legislature did not intend to punish them separately. Thus, Hector's convictions for coercion and dissuading a witness do not violate the Double Jeopardy Clause and are not redundant.

(ECF No. 16-5 at 5-7).

1        Gonzalez was convicted of coercion and preventing or dissuading a victim or witness from

2   reporting a crime, commencing a prosecution, or causing an arrest. (ECF No. 15-5 at 3-4).

3   Coercion is defined as follows:

4        It is unlawful for a person, with the intent to compel another to do or abstain from
         doing an act which the other person has a right to do or abstain from doing, to:

5                (a) Use violence or inflict injury upon the other person or any of the other
                 person's family, or upon the other person's property, or threaten such

6                violence or injury;
                 (b) Deprive the person of any tool, implement or clothing, or hinder the

7                person in the use thereof; or
                 (c) Attempt to intimidate the person by threats or force.

8

9   Nev. Rev. Stat. § 207.190(1). And preventing or dissuading a victim or witness from reporting a

10  crime, commencing a prosecution, or causing an arrest is defined as:

11       A person who, by intimidation or threatening another person, prevents or dissuades
         a victim of a crime, a person acting on behalf of the victim or a witness from:

12               (a) Reporting a crime or possible crime to a:
                         (1) Judge;

13                       (2) Peace officer;
                         (3) Parole or probation officer;

14                       (4) Prosecuting attorney;
                         (5) Warden or other employee at an institution of the Department of

15               Corrections; or
                         (6) Superintendent or other employee at a juvenile correctional

16               institution;
                 (b) Commencing a criminal prosecution or a proceeding for the revocation

17               of a parole or probation, or seeking or assisting in such a prosecution or
                 proceeding; or

18               (c) Causing the arrest of a person in connection with a crime,
         or who hinders or delays such a victim, agent or witness in an effort to carry out

19       any of those actions is guilty of a category D felony and shall be punished as
         provided in NRS 193.130.

20

21  Nev. Rev. Stat. § 199.305(1).

22       The Fifth Amendment's Double Jeopardy Clause prohibits multiple punishments for the

23  same offense. U.S. Const. amend. V. The Double Jeopardy Clause provides three related

protections: (1) it prohibits a second prosecution for the same offense after acquittal; (2) it prohibits a second prosecution for the same offense after conviction; and (3) it prohibits multiple punishments for the same offense. United States v. Wilson, 420 U.S. 332, 343 (1975). "[T]he final component of double jeopardy—protection against cumulative punishments—is designed to ensure that the sentencing discretion of courts is confined to the limits established by the legislature." Ohio v. Johnson, 467 U.S. 493, 499 (1984) ("Because the substantive power to prescribe crimes and determine punishments is vested with the legislature, . . . the question under the Double Jeopardy Clause whether punishments are 'multiple' is essentially one of legislative intent.").

The "same-elements" test established in Blockburger v. United States, 284 U.S. 299 (1932) is used to determine whether multiple prosecutions or multiple punishments involve the same offense. United States v. Dixon, 509 U.S. 688, 696 (1993). The test "inquires whether each offense contains an element not contained in the other; if not, they are the 'same offence' and double jeopardy bars additional punishment and successive prosecution." Id.; see also Ball v. United States, 470 U.S. 856, 861 (1985) ("The assumption underlying the Blockburger rule is that Congress ordinarily does not intend to punish the same offense under two different statutes."). "Conversely, '[d]ouble jeopardy is not implicated so long as each violation requires proof of an element which the other does not.'" Wilson v. Belleque, 554 F.3d 816, 829 (9th Cir. 2009) (quoting United States v. Vargas-Castillo, 329 F.3d 715, 720 (9th Cir. 2003). "'If each [offense] requires proof of a fact that the other does not, the Blockburger test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes.'" Id. (quoting Iannelli v. United States, 420 U.S. 770, 785 n.17 (1975)). The "same act or transaction" can "constitute[ ] a violation of two distinct statutory provisions." Blockburger, 284 U.S. at 304.

In deciding the claims in Ground 2, the Nevada Supreme Court relied on the correct federal law standards and did not apply them unreasonably to the facts of Gonzalez's case. (ECF No. 16-5 at 5-7). Indeed, coercion requires a specific intent that is not required by preventing or dissuading a victim. Similarly, preventing or dissuading a victim requires the preventing or dissuading of a victim from reporting a crime, commencing a criminal prosecution, or causing the arrest of a person. Nev. Rev. Stat. § 199.305(1). Coercion is broader and does not contain these requirements. See Nev. Rev. Stat. § 207.190(1). Because coercion and preventing or dissuading a victim each "contain[ ] an element not contained in the other," Dixon, 509 U.S. at 696, there is no Double Jeopardy Clause violation. Therefore, the Nevada Supreme Court's ruling was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, and was not based on an unreasonable determination of the facts in light of the evidence. See 28 U.S.C. § 2254(d). The Court will deny Gonzalez habeas corpus relief with respect to Ground 2.

## C.   Ground 4

In Ground 4, Gonzalez claims that his federal constitutional rights were violated when the State committed misconduct during closing arguments. (ECF No. 10 at 17). Specifically, Gonzalez argues that the State interjected personal opinions regarding the evidence, referenced facts not in evidence, and vouched for a government witness. Id. On Gonzalez's direct appeal, the Nevada Supreme Court held:

> "[T]o preserve a claim of prosecutorial misconduct, the defendant must object to the misconduct at trial . . . ." Valdez v. State, 124 Nev. 112, 1190, 196 P.3d 465, 477 (2008). Because Hector failed to object to any of the prosecutor's statements, we will conduct a plain error review. See id. In determining if the prosecutor's statements amounted to prejudicial misconduct, we look at whether the statements "so infected the proceedings with unfairness as to result in a denial of due process." Anderson v. State, 121 Nev. 511, 516, 118 P.3d 184, 187 (2005).

<u>The prosecutor did not interject her personal opinions</u>

Hector argues that the prosecutor interjected her personal belief that Hector's sister must have told Hector about Ana's relationship with Campos, because the prosecutor's family would have told her. Hector contends that the prosecutor also interjected her personal belief by stating that the human memory is fallible, as evidenced by her own inability to recall exact testimony offered in this case. Lastly, Hector argues that the prosecutor interjected her personal belief by stating that if an intruder awoke her in the middle of the night, she would yell and scream too. Hector contends that all of this, coupled with the prosecutor's reference to unsupported facts and her vouching for Ana, amounts to reversible prosecutorial misconduct because the verdict may have been different without it. Because we hold the prosecutor's statements did not amount to misconduct, this issue does not warrant reversal.

<u>The prosecutor did not reference facts that were not in evidence</u>

Hector contends that the prosecutor argued that Hector's sister must have told him about Ana's relationship with Campos, which is not represented in the evidence. Hector also argues that the prosecutor's story about how she could not recall specific testimony was improper because there was no evidence to support the story. Hector contends that this, coupled with the prosecutor's interjection of her personal opinions and her vouching for Ana, amounts to reversible prosecutor misconduct because the verdict may have been different without it. We disagree.

"[A] prosecutor may not make statements unsupported by evidence produced at trial." <u>Guy v. State</u>, 108 Nev. 770, 780, 839 P.2d 578, 585 (1992).

The prosecutor did not make statements unsupported by the evidence; rather, she made permissible inferences from the evidence. <u>See Jones</u>, 113 Nev. at 467, 937 P.2d at 63. Thus, the prosecutor did not reference facts that were not in evidence, and Hector failed to demonstrate plain error.

<u>The prosecutor did not vouch for Ana</u>

Hector contends that the prosecutor vouched for Ana by attributing any problems with Ana's testimony to the fallibility of human memory and by personally validating Ana's angry response to Hector's initial visit. Hector contends that this, coupled with the prosecutor's interjection of her personal opinions and her reference to unsupported facts, amounts to reversible prosecutor misconduct because the verdict may have been different without it. We disagree.

A prosecutor "may not vouch for a witness; such vouching occurs when the prosecution places 'the prestige of the government behind the witness' by providing 'personal assurances of [the] witness's veracity.'" <u>Browning v. State</u>, 120 Nev. 347,

13

359, 91 P.3d 39, 48 (2004) (quoting U.S. v. Kerr, 981 F.2d 1050, 1053 (9th Cir. 1992)).

> The prosecutor did not place the prestige of the government behind Ana's testimony by offering personal assurances of her veracity. Thus, the prosecutor did not vouch for Ana, and Hector failed to demonstrate plain error.

(ECF No. 16-5 at 8-10).

The State made several arguments that Gonzalez asserts were improper. First, the State argued that Gonzalez had knowledge of his wife's alleged affair, which tended to show that he had a potential motive in attacking her:

> So how do we know that Hector didn't know about Charles? Well, I don't think we really know that because his sister sure thought there was something going on between Ana and Charles. And I'll tell you what, my sister would have called me. And I probably would have called my brother. So the fact that it's argued that he didn't know about that I think can be contradicted by the fact his sister comes in here, takes the stand and says oh, she was hanging out with Charles and Charlie – Charles. She most certainly would have told her brother because obviously you can tell by the way she was talking, she was completely offended by it. She was offended by the fact that a woman would even have a man as a friend.

(ECF No. 15-1 at 207). Second, the State tried to explain away the discrepancies between Ana and Elsie's testimonies:

> Now, [Gonzalez's trial counsel] talked a lot about how Elsie and Ana's versions of the stories differ. Well, what is great about the human memory is that we all remember things differently. As I stand before you, [co-counsel for the State] and I earlier were trying to remember what one of the witnesses said, exactly what they said. We know this case inside and out, we've read the statements, we've talked to people, we sat through the evidence. We've read them again, we've eaten this case, but yet, neither him nor I can remember exactly which way it went. He said one thing, I said the other.

Id. at 207-208. Third, the State attempted to justify Ana's angry reaction to finding Gonzalez in her room:

> Now, there's a big deal made that Ana was the one that was upset. Elsie heard Ana and that Ana was upset. Well, tell you what, if I have a TPO against you and I'm asleep and it's 1:30 in the morning and you come into my house and you come into

my bedroom and I wake up, I'm going to be pissed. And I'm going to be loud about it, and I'm going to be angry.

Id. at 209.

"[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." Smith v. Phillips, 455 U.S. 209, 219 (1982). "The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)). A court must judge the remarks "in the context in which they are made." Boyde v. California, 494 U.S. 370, 385 (1990). The fairness of a trial is measured "by considering, inter alia, (1) whether the prosecutor's comments manipulated or misstated the evidence; (2) whether the trial court gave a curative instruction; and (3) the weight of the evidence against the accused." Tan v. Runnels, 413 F.3d 1101, 1115 (9th Cir. 2005). "[P]rosecutorial misconduct[ ] warrant[s] relief only if [it] 'had substantial and injurious effect or influence in determining the jury's verdict.'" Wood v. Ryan, 693 F.3d 1104, 1113 (9th Cir. 2012) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637-38 (1993)).

With regard to the State's argument about Ana's relationship with Charles, Gonzalez argues that the State tried to prove facts not in evidence and improperly injected its personal opinions into the case. (ECF No. 32 at 29). Because the State presented its personal belief that Gonzalez likely knew about Ana's relationship with Charles, the State's argument was just shy of crossing the line into being improper. See United States v. Young, 470 U.S. 1, 8-9 (1985) ("[P]rosecutor[s] must refrain from interjecting personal beliefs into the presentation of [the] case."). However, the State's belief was simply an extrapolation made from the testimony presented. See Drayden v. White, 232 F.3d 704, 713 (9th Cir. 2000) (concluding that the State's

1   improper closing argument did not infect the trial with unfairness because "the prosecutor's

2   statements were supported by the evidence and reasonable inferences that could be drawn from

3   the evidence"). Moreover, this belief was not an assertion of facts not in evidence. Indeed, the

4   State prefaced this line of argument with "I don't think we really know." (ECF No. 15-1 at 207).

5         With regard to the State's argument about the discrepancies between Ana's and Elsie's

6   testimony and Ana's reaction to finding Gonzalez in her room, Gonzalez argues that these were

7   improper insertions of personal opinions and also improper vouching. (ECF No. 32 at 29-30).

8   "Vouching consists of placing the prestige of the government behind a witness through personal

9   assurances of the witness's veracity, or suggesting that information not presented to the jury

10   supports the witness's testimony." United States v. Necoechea, 986 F.2d 1273, 1276 (9th Cir.

11   1993). Several factors are assessed in determining whether there was improper vouching:

12       the form of vouching; how much the vouching implies that the prosecutor has extra-
       record knowledge of or the capacity to monitor the witness's truthfulness; any

13       inference that the court is monitoring the witness's veracity; the degree of personal
       opinion asserted; the timing of the vouching; the extent to which the witness's

14       credibility was attacked; the specificity and timing of a curative instruction; the
       importance of the witness's testimony and the vouching to the case overall.

15

16   Id. at 1278.

17         Neither of the statements made by the State amounted to vouching. The State merely

18   explained that people remember facts differently and that Ana had good reason to be upset. This

19   does not amount to "placing the prestige of the government behind a witness." Necoechea, 986

20   F.2d at 1276. Additionally, the State's explanation that people remember facts differently is not a

21   personal opinion; it is an argument. Finally, the State's argument that it would have been upset

22   had it been in Ana's place starts to cross the line into being an improper statement; however, this

23   single statement cannot be said to have "'so infected the trial with unfairness as to make the

resulting conviction a denial of due process.'" Darden, 477 U.S. at 181 (quoting Donnelly, 416 U.S. at 643); see also United States v. Younger, 398 F.3d 1179, 1190 (9th Cir. 2005) (holding that a single improper statement did not materially affect the verdict).

Moreover, even if the above-mentioned arguments amounted to misconduct, the state district court instructed the jury that the State's arguments were not evidence. See Drayden, 232 F.3d at 713 (explaining that if a cautionary instruction was given by the state district court, the jury is presumed to have followed it); see also Allen v. Woodford, 395 F.3d 979, 998 (9th Cir. 2005) (finding that prosecutorial misconduct did not amount to a due process violation where the trial court gave an instruction that the attorneys' statements were not evidence and where the prosecutors presented substantial evidence of the defendant's guilt). In fact, the state district court instructed the jury that "[s]tatements, arguments and opinions of counsel are not evidence in the case," and "whatever counsel may say, you will bear in mind that it is your duty to be governed in your deliberation by the evidence as you understand it." (ECF No. 15-4 at 11, 35). Further, there was also substantial evidence of Gonzalez's guilt, which is discussed in Ground 6, so it cannot be said that any of the above-mentioned arguments "'had substantial and injurious effect or influence in determining the jury's verdict.'" Wood, 693 F.3d at 1113 (quoting Brecht, 507 U.S. at 637-38). Therefore, the Nevada Supreme Court's ruling was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, and was not based on an unreasonable determination of the facts in light of the evidence. See 28 U.S.C. § 2254(d). The Court will deny Gonzalez habeas corpus relief with respect to Ground 4.

///

///

///

**D.    Ground 6**

In Ground 6, Gonzalez claims that his federal constitutional rights were violated because there was insufficient evidence to convict him. (ECF No. 10 at 26). On Gonzalez's direct appeal, the Nevada Supreme Court held:

> Hector also argues that there was insufficient evidence to convict him. When considering a sufficiency of the evidence challenge, we determine "'whether, after viewing the evidence in the light most favorable to the prosecution, any rational [juror] could have found the essential elements of the crime beyond a reasonable doubt.'" McNair v. State, 108 Nev. 53, 56, 825 P.2d 571, 573 (1992) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis omitted)). Hector's attack on the sufficiency of the evidence is that the State relied on the victimization of Ana to obtain the conviction. He fails to point directly to any inconsistencies or flaws in the evidence. The State presented enough evidence to allow a rational juror to convict Hector.

(ECF No. 16-5 at 3 n.1).

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). A federal habeas petitioner "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). On direct review of a sufficiency of the evidence claim, a state court must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). The evidence is to be viewed "in the light most favorable to the prosecution." See id. Federal habeas relief is available only if the state-court determination that the evidence was sufficient to support a conviction was an "objectively unreasonable" application of Jackson. See Juan H., 408 F.3d at 1275 n.13.

The facts of the case were presented primarily through the testimony of Ana, Gonzalez's wife, and Elsie, Gonzalez's sister-in-law. (ECF No. 14-8 at 42, 165). Ana testified that she filed for and received a protective order and an extended protective order against Gonzalez. Id. at 41, 45. On January 21, 2009, when the protective order was still in place, Ana woke up at approximately 1:00 a.m. to find Gonzalez standing in her room. Id. at 58-59, 113. Ana was living at her mother's house at the time, and Gonzalez was not invited over and did not have a key to the house. Id. at 44, 59, 92. Gonzalez argued with Ana for not contacting him when one of their daughters was sick. Id. Gonzalez squeezed Ana's neck and hit her. Id. at 60. Ana called for Elsie, who was sleeping in another bedroom within their mother's house, to help her. Id. at 64-65. Elsie testified that Gonzalez left the residence after she told him that she was going to call the police. Id. 170.

Ana locked her bedroom door and went back to sleep. Id. at 67. Elsie also "made sure that all the doors were locked" after Gonzalez left. Id. at 170. Gonzalez returned about a half hour later and kicked Ana's bedroom door open. Id. at 68, 190. Gonzalez jumped on Ana, grabbed her neck, and stabbed her in the neck with a knife. Id. at 71-72. Dr. Timothy Browder, an attending trauma surgeon at the University Medical Center, testified that the stab "lacerated a branch off of [Ana's] carotid artery." (ECF No. 15-1 at 34).

Elsie testified that she woke up to her "sister screaming to call the police." (ECF No. 14-8 at 171). As Elsie was trying to call 911, Gonzalez kicked open her bedroom door. Id. Gonzalez "snatched [Elsie's] phone and he grabbed [Elsie] out of bed." Id. at 172. Gonzalez threw Elsie's phone on the floor and broke it into three pieces. Id. at 172, 182. As Gonzalez was grabbing Elsie's arm to take her out of bed, he cut her fingers. Id. at 172. Gonzalez placed the knife on Elsie's neck and told her that if she called the police, he was going to cut her. Id.

1      Elsie saw that her sister was bleeding badly and tried to call the police, but Gonzalez would

2 not let her. Id. at 174. Gonzalez eventually "plug[ged] in the jack of the phone" in the living room

3 so Elsie could use it. Id. at 176. Gonzalez did not allow Elsie to tell the 911 operator what happened

4 to Ana; instead, he only allowed her to call for an ambulance. Id. at 178-79.

### 1.    Burglary while in possession of a deadly weapon in violation of a court order

7      Nevada law provides that "a person who, by day or night, enters any house [or]

8 room[ ] . . .  with the intent to commit . . . assault or battery on any person . . . is guilty of burglary."

9 Nev. Rev. Stat. § 205.060. It also provides that:

> Every person who unlawfully breaks and enters or unlawfully enters any house [or]
> room[ ] . . . may reasonably be inferred to have broken and entered or entered it
> with intent to commit grand or petit larceny, assault or battery on any person or a
> felony therein, unless the unlawful breaking and entering or unlawful entry is
> explained by evidence satisfactory to the jury to have been made without criminal
> intent.

14 Nev. Rev. Stat. § 205.065. Sentencing enhancements are allowed when the burglary used a deadly

15 weapon and when the burglary was committed in violation of a protective order. Nev. Rev. Stat. §

16 193.165; Nev. Rev. Stat. § 193.166.

17      The evidence admitted at trial demonstrates that Gonzalez entered Ana's mother's house

18 unlawfully. In fact, Gonzalez did not have a key to the house, was not invited over, and entered

19 the residence even though the doors were locked. (ECF No. 14-8 at 59, 92, 170). Gonzalez argues

20 that there was no evidence that he actually planned an assault or battery when he came back to the

21 house a second time. (ECF No. 32). However, because Gonzalez's intent to commit a battery can

22 be inferred by his unlawful entry, Nev. Rev. Stat. § 205.065, this argument lacks merit. With regard

23 to the sentencing enhancements, Ana testified that she had a protective order against Gonzalez at

the time he entered the residence and attacked her with a knife. (ECF No. 14-8 at 41, 45, 71-72). Accordingly, there was sufficient evidence presented at trial to demonstrate that Gonzalez committed burglary while in possession of a deadly weapon in violation of a court order. See In re Winship, 397 U.S. at 364.

> **2.    Battery constituting domestic violence against Ana with the use of a deadly weapon resulting in substantial bodily harm in violation of a court order**

Nevada law provides that "'[b]attery' means any willful and unlawful use of force or violence upon the person of another," Nev. Rev. Stat. § 200.481(1), and that "[d]omestic violence occurs when a person commits [a battery] against or upon the person's spouse or former spouse [or] any other person to whom the person is related by blood or marriage." Nev. Rev. Stat. § 33.018(1)(a). "[S]ubstantial bodily harm" is defined as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ; or . . . [p]rolonged physical pain." Nev. Rev. Stat. § 0.060.

The evidence demonstrates that Gonzalez willfully and unlawfully committed violence against Ana, his wife at the time, by stabbing her in the neck. (ECF No. 14-8 at 42, at 71-72). Because Dr. Browder testified that the stab "lacerated a branch off of [Ana's] carotid artery" (ECF No. 15-1 at 34), it is clear that Ana suffered substantial bodily harm as a result of the stabbing. Nev. Rev. Stat. § 0.060. Again, with regard to the sentencing enhancements, Ana testified that she had a protective order against Gonzalez at the time he stabbed her with the knife. (ECF No. 14-8 at 41, 45, 71-72). Accordingly, there was sufficient evidence presented at trial to demonstrate that Gonzalez committed battery constituting domestic violence against Ana with the use of a deadly weapon resulting in substantial bodily harm in violation of a court order. See In re Winship, 397

U.S. at 364. Gonzalez's only argument is that the only eyewitness to the attack was Ana and Ana's story was not credible. (ECF No. 32 at 33). Because evidence is viewed "in the light most favorable to the prosecution," <u>Jackson</u>, 443 U.S. at 319, this argument lacks merit.

### 3. Battery constituting domestic violence against Elsie with the use of a deadly weapon in violation of a court order

Gonzalez argues that there was no evidence that he actually intended to cut Elsie with the knife. (ECF No. 32 at 33). Battery is a general intent crime. <u>See Hubbard v. State</u>, 134 Nev. 450, 455, 422 P.3d 1260, 1264 (2018). "General intent is the intent to do that which the law prohibits." <u>Bolden v. State</u>, 121 Nev. 908, 923, 124 P.3d 191, 201 (2005) (internal quotation marks omitted), <u>receded from on other grounds by Cortinas v. State</u>, 124 Nev. 1013, 1026-27, 195 P.3d 315, 324 (2008)). Because "[i]t is not necessary for the prosecution to prove that the defendant intended the precise harm or the precise result which eventuated" for a general intent crime, <u>id.</u>, Gonzalez's argument lacks merit.

Turning to the evidence, the record demonstrates that Gonzalez willfully and unlawfully committed violence against Elsie, his sister-in-law, by cutting her hand with a knife. (ECF No. 14-8 at 165, 172). The record also demonstrates that the protective order prevented Gonzalez from going within 100 yards of Elsie and Ana's mother's residence. (ECF No. 33-4 at 4). Accordingly, there was sufficient evidence presented at trial to demonstrate that Gonzalez committed battery constituting domestic violence against Elsie with the use of a deadly weapon in violation of a court order. <u>See In re Winship</u>, 397 U.S. at 364.

### 4. Coercion with the use of a deadly weapon

Nevada law provides that:

It is unlawful for a person, with the intent to compel another to do or abstain from doing an act which the other person has a right to do or abstain from doing, to:

(a) Use violence or inflict injury upon the other person or any of the other person's family, or upon the other person's property, or threaten such violence or injury;

(b) Deprive the person of any tool, implement or clothing, or hinder the person in the use thereof; or

(c) Attempt to intimidate the person by threats or force.

Nev. Rev. Stat. § 207.190(1).

Elsie testified that Gonzalez placed the knife on her neck and told her that if she called the police, he was going to cut her. (ECF No. 14-8 at 172). Because Gonzalez threatened Elsie with violence if she called the police—an act which she had a right to do—there was sufficient evidence demonstrating that Gonzalez committed coercion with the use of a deadly weapon. In re Winship, 397 U.S. at 364. Gonzalez argues that the State did not present any evidence that he successfully stopped Elsie from ever calling the police—as opposed to just slightly delaying her from calling the authorities. (ECF No. 32 at 35). However, the act of coercion with the use of a deadly weapon was complete as soon as Gonzalez made the threat to Elsie. See Nev. Rev. Stat. § 207.190(1). It is immaterial whether Gonzalez later backed down from that threat.

### 5.    Preventing or dissuading a victim or witness from reporting a crime, commencing a prosecution, or causing an arrest

Nevada law prohibits a person from "prevent[ing] or dissuad[ing] a victim of a crime, a person acting on behalf of the victim or a witness from . . . [r]eporting a crime . . . to a . . . [p]eace officer." Nev. Rev. Stat. § 199.305(1)(a)(2). Gonzalez threw Elsie's phone on the floor and broke into three pieces as she was trying to call 911. (ECF No. 14-8 at 171-72, 182). Gonzalez also placed the knife on Elsie's neck and told her that if she called the police, he was going to cut her. Id. at 172. Finally, when he eventually allowed Elsie to call for help, he only permitted her to request an ambulance; he did not allow Elsie to tell the 911 operator how Ana sustained her injuries. Id. at 178-79. Accordingly, there was sufficient evidence presented at trial to demonstrate that Gonzalez

23

committed the crime of preventing or dissuading a victim or witness from reporting a crime on three separate occasions. In re Winship, 397 U.S. at 364.

In sum, because there was sufficient evidence presented at trial to demonstrate that Gonzalez committed each of the charges for which he was convicted, the Nevada Supreme Court's ruling was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, and was not based on an unreasonable determination of the facts in light of the evidence. See 28 U.S.C. § 2254(d). The Court will deny Gonzalez habeas corpus relief with respect to Ground 6.

**E.      Ground 7**

In Ground 3, Gonzalez claims that cumulative errors of Grounds 1, 2, 4, and 6 warrant the reversal of his convictions. (ECF No. 10 at 28; ECF No. 32 at 36). On Gonzalez's direct appeal, the Nevada Supreme Court held "Hector also argues that the cumulative error warrants reversal. As we conclude that there was no error, there can be no cumulative error warranting reversal." (ECF No. 16-5 at 4). The only possible error was the State's argument that it would have been upset had it been in Ana's place. However, because there were no other errors to cumulate, the Nevada Supreme Court's ruling was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, and was not based on an unreasonable determination of the facts in light of the evidence. See 28 U.S.C. § 2254(d). The Court will deny Gonzalez habeas corpus relief with respect to Ground 7.

**F.      Ground 8**

In Ground 8, Gonzalez claims that his federal constitutional rights were violated when his trial counsel was ineffective. (ECF No. 10 at 31). On appeal of Gonzalez's post-conviction petition for a writ of habeas corpus, the Nevada Supreme Court held:

24

When reviewing the district court's resolution of an ineffective-assistance claim, we give deference to the court's factual findings if they are supported by substantial evidence and not clearly wrong but review the court's application of the law to those facts de novo. Lader v. Warden, 121 Nev. 682, 686, 120 P.3d 1164, 1166 (2005). The district court conducted an evidentiary hearing and heard testimony from Gonzalez and one of the two attorneys who represented him at trial. The district court found that Gonzalez failed to demonstrate that trial counsel were deficient or [caused] prejudice. See Strickland v. Washington, 466 U.S. 668, 687-88, 694 (1984); Kirksey v. State, 112 Nev. 980, 987, 923 P.2d 1102, 1107 (1996); see also Cullen v. Pinholster, 563 U.S. ___, ___, 131 S.Ct. 1388, 1408 (2011) ("Surmounting Strickland's high [b]ar is never an easy task." (quotation marks omitted) (alteration omitted)). We conclude that the district court's findings are supported by substantial evidence, see Riley v. State, 110 Nev. 638, 647, 878 P.2d 272, 278 (1994), and the district court did not err by rejecting Gonzalez's ineffective-assistance claims.

(ECF No. 16-17 at 3). As these grounds of ineffective assistance of counsel—Grounds 8a through 8g—were denied on the merits by the Nevada Supreme Court without much analysis, the question here is whether Gonzalez has shown that there was no reasonable basis for the Nevada Supreme Court's ruling. See Harrington, 562 U.S. at 98.

In Strickland v. Washington, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring the petitioner to demonstrate (1) that the attorney's "representation fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. 668, 688, 694 (1984). A court considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687. And, to establish prejudice under Strickland, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on

the outcome of the proceeding." Id. at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687.

Where a state district court previously adjudicated the claim of ineffective assistance of counsel, under Strickland, establishing that the decision was unreasonable is especially difficult. See Harrington, 562 U.S. at 104-05. In Harrington, the United States Supreme Court instructed:

> Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult. The standards created by Strickland and § 2254(d) are both "highly deferential," [Strickland, 466 U.S. at 689]; Lindh v. Murphy, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, Knowles[ v. Mirzayance, 556 U.S. 111, 123 (2009)]. The Strickland standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonably argument that counsel satisfied Strickland's deferential standard.

Harrington, 562 U.S. at 105; see also Cheney v. Washington, 614 F.3d 987, 995 (9th Cir. 2010) ("When a federal court reviews a state court's Strickland determination under AEDPA, both AEDPA and Strickland's deferential standards apply; hence, the Supreme Court's description of the standard as 'doubly deferential.'").

In analyzing a claim of ineffective assistance of counsel under Strickland, a court may first consider either the question of deficient performance or the question of prejudice; if the petitioner fails to satisfy one element of the claim, the court need not consider the other. See Strickland, 466 U.S. at 697.

### 1.    Ground 8a

In Ground 8a, Gonzalez claims that his federal constitutional rights were violated when his trial counsel failed to do necessary investigations and to consult necessary experts. (ECF No. 10 at 31). Gonzalez explains that his trial counsel's theory of defense was that Ana's wounds were

self-inflicted either deliberately or accidentally, but his trial counsel failed to investigate that theory of defense or consult with a fingerprint expert, a forensic pathologist, or a crime scene expert. Id. Gonzalez asserts that there is a reasonable probability that hiring a fingerprint expert or an expert to evaluate Ana's wounds could have produced a different result at trial. (ECF No. 32 at 39).

Kathryn Aoyama, an employee of the Las Vegas Metropolitan Police Department's forensic laboratory's latent print unit, examined the knife, a "chef's secret knife approximately four and a quarter inch blade with a black handle," and explained that she observed a patent print on the blade of the knife. (ECF No. 15-1 at 16, 18, 20). "There were no other prints other than the patent print that was visual upon initial inspection." Id. at 22. Aoyama was not able to compare the patent print because "there was not sufficient ridge detail to compare to a known set of prints." Id.

Gonzalez argues that his trial counsel was deficient for failing to have an expert rebut the findings of Aoyama. This argument is without merit. Gonzalez presents no evidence that his own fingerprint expert would have been helpful to his defense or would have been able to compare the patent print. See Harrington, 562 U.S. at 107 ("Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies."); cf. Strickland, 466 U.S. at 691 (1984) ("In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."). Moreover, there is no requirements that Gonzalez present an expert witness based entirely on the fact that the State presented an expert witness. See Harrington, 562 U.S. at 111 ("Strickland does not enact Newton's third law for the presentation of evidence, requiring for every prosecution expert an equal and

opposite expert from the defense."). Finally, although Gonzalez's trial counsel testified at the post-conviction evidentiary hearing that he did not recall the fingerprint issue (ECF No. 16-13 at 20-21), it is possible that the lack of consultation with a fingerprint expert prior to trial was strategic. In fact, Gonzalez's trial counsel may have been fearful that a defense expert would be able to compare the print and that it would match Gonzalez's print. Therefore, Gonzalez's trial counsel's actions in not consulting a fingerprint expert did not "f[a]ll below an objective standard of reasonableness." Strickland, 466 U.S. at 688.

        Turning next to the argument that Gonzalez's trial counsel should have hired an expert to evaluate the cause of Ana's wounds, Gonzalez's trial counsel testified at the post-conviction hearing that "part of [his] defense revolved around the victim in this case having an affair" and that "one of [his] theories of the case was that the victim in fact stabbed herself." (ECF No. 16-13 at 16). Another theory of defense was that Ana's wounds were accidental. Id. at 19; see also ECF No. 15-1 at 203 (closing argument of Gonzalez's trial counsel: "That's why the only story that makes any sense at all is the accident version of facts which, she again, testified to on the stand herself calling this an accident multiple times")). Because his theory of defense revolved around the argument that Ana's stabbing was self-inflicted or accidental, it is reasonable that Gonzalez's trial counsel would have consulted with an expert to determine whether he could support those theories with evidence. However, even if Gonzalez's trial counsel was deficient in failing to do so, Gonzalez fails to demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. First, Dr. Timothy Browder, an attending trauma surgeon at the University Medical Center, testified that he attended to Ana after she had been stabbed and that her injuries could have been self-inflicted. (ECF No. 15-1 at 27, 29, 42). This testimony did not sway the jury into believing

1   Gonzalez's theory of defense, so it is mere speculation that further evidence presented by

2   Gonzalez's trial counsel tending to show that Ana's wounds were accidental or self-inflicted would

3   have convinced the jury. See Djerf v. Ryan, 931 F.3d 870, 881 (9th Cir. 2019) ("Strickland

4   prejudice is not established by mere speculation.").

5          Therefore, the Nevada Supreme Court's ruling was not contrary to, or an unreasonable

6   application of, clearly established federal law, as determined by the Supreme Court, and was not

7   based on an unreasonable determination of the facts in light of the evidence. See 28 U.S.C. §

8   2254(d). The Court will deny Gonzalez habeas corpus relief with respect to Ground 8a.

9          Gonzalez also argues that if this court is not inclined to grant relief on this ground, it should

10  allow him leave to conduct further factual development, including through an evidentiary hearing.

11  (ECF No. 32 at 40, 42). The general standard for holding an evidentiary hearing in a federal habeas

12  action is governed by 28 U.S.C. § 2254(e)(2):

13          If the applicant has failed to develop the factual basis of a claim in state court
            proceedings, the court shall not hold an evidentiary hearing on the claim unless the
14          applicant shows that –
                (A) the claim relies on –
15                  (i) a new rule of constitutional law, made retroactive to cases on
                    collateral review by the Supreme Court, that was previously
16                  unavailable; or
                    (ii) a factual predicate that could not have been previously
17                  discovered through the exercise of due diligence; and
                (B) the facts underlying the claim would be sufficient to establish by clear
18              and convincing evidence that but for constitutional error, no reasonable
                factfinder would have found the applicant guilty of the underlying offense.
19

20         Because this Court has already determined that Gonzalez's trial counsel was not deficient

21  for failing to consult with a fingerprint expert, neither further factual development nor any

22  evidence that would be proffered at an evidentiary hearing—likely a fingerprint expert—would

23  affect the Court's reasons for denying this portion of Ground 8a. Turning to the second portion of

this ground, if Gonzalez could find an expert to testify that Ana's wounds were unquestionably self-inflicted—as opposed to it just being possible that the wounds were self-inflicted as was testified to by Dr. Browder—there is the possibility that he could meet the <u>Strickland</u> prejudice prong. However, Gonzalez fails to meet the requirements of 28 U.S.C. § 2254(e)(2). Indeed, Gonzalez fails to explain why this evidence was not or could not have been presented at the state district court post-conviction evidentiary hearing. Further, evidentiary hearings are not authorized for claims adjudicated on the merits in the state court. <u>See Pinholster</u>, 563 U.S. at 183-84. Accordingly, there is no good cause to grant these requests.

### 2. Ground 8b

In Ground 8b, Gonzalez claims that his federal constitutional rights were violated when his trial counsel failed to file numerous pretrial motions. These motions are described in Grounds 8c to 8g, and as such, will be discussed below.

### 3. Ground 8c

In Ground 8c, Gonzalez claims that his federal constitutional rights were violated when his trial counsel failed to file a motion to dismiss the indictment because he did not receive notice of the pending grand jury proceedings. (ECF No. 10 at 35). Gonzalez explains that the State had planned to conduct a preliminary hearing, but it later elected to dismiss the charges and instead institute grand jury proceedings. (ECF No. 32 at 43). The State allegedly gave the public defender notice of the indictment on the day that the preliminary hearing was supposed to take place; however, the State dismissed the justice court case on that date, so the public defender was no longer representing Gonzalez. <u>Id.</u>

During the indictment warrant return proceeding, Gonzalez's counsel, Alexander Hubert, indicated that the public defender's office was reappointed to represent Gonzalez following the

indictment. (ECF No. 14-5 at 4). The public defender explained that "A Marcum notice was served and then, you know, we kind of move on. And, you know, and ultimately I wasn't the attorney of record anymore for Mr. Gonzalez. The notice -- the Marcum notice is in the file, but it's from April." Id. at 5. During that proceeding, Gonzalez stated that he knew nothing about the grand jury proceeding. Id. at 7. Five days later, at Gonzalez's initial arraignment, his counsel, Erika Ballou, explained that "when this was scheduled to go to preliminary hearing the State handed me a notice of intent to seek indictment. Mr. Gonzalez was released. I never received anything after that saying that the State was going to the Grand Jury on this. Mr. Gonzalez was not informed." (ECF No. 14-6 at 7). Gonzalez's family law attorney stated at the arraignment that Gonzalez "was totally unaware of having been indicted." Id. at 8.

"[R]easonable notice is required before a defendant is indicted by a grand jury." Sheriff, Humboldt County v. Marcum, 105 Nev. 824, 827, 783 P.2d 1389, 1391 (1989). Nevada law requires that this reasonable notice be served "upon a person whose indictment is being considered by the grand jury," and that "[t]he notice is adequate if it . . . is given to the person, the person's attorney of record or an attorney who claims to represent the person." Nev. Rev. Stat. § 172.241(2)(a). It is clear from the record that the State complied with Marcum and Nev. Rev. Stat. § 172.241(2)(a) by giving notice to Gonzalez's counsel. Indeed, both Mr. Hubert and Ms. Ballou indicated that they had received notice of the grand jury proceedings. (ECF No. 14-5 at 5) (explanation of Mr. Hubert that "A Marcum notice was served" and "the Marcum notice is in the file); see also ECF No. 14-6 at 7 (explanation of Ms. Ballou that "the State handed me a notice of intent to seek indictment"). And although Gonzalez maintained that he was unaware of the grand jury proceedings at the indictment warrant return proceeding and his initial arraignment, he

testified at the post-conviction evidentiary hearing that he was told about "a jury, but [he] didn't understand a Grand Jury." (ECF No. 16-3 at 8).

Because there was no violation of <u>Marcum</u> or Nev. Rev. Stat. § 172.241(2)(a), it cannot be concluded that Gonzalez's trial counsel's actions in not filing a motion to dismiss the indictment "fell below an objective standard of reasonableness." <u>Strickland</u>, 466 U.S. at 688; <u>cf. Williams v. Stewart</u>, 441 F.3d 1030, 1042 (9th Cir. 2006) ("[A]ny constitutional error in the grand jury proceedings is harmless because [petitioner] was ultimately convicted of the offenses charged."). Therefore, the Nevada Supreme Court's ruling was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, and was not based on an unreasonable determination of the facts in light of the evidence. 28 U.S.C. § 2254(d). The Court will deny Gonzalez habeas corpus relief with respect to Ground 8c.

### 4.    Ground 8d

In Ground 8d, Gonzalez claims that his federal constitutional rights were violated when his trial counsel failed to file a motion to bifurcate the sentence enhancement, or at the very least, request a limiting instruction. (ECF Nos. 10 at 36, 32 at 45). It has already been determined in Ground 1 that Gonzalez's federal constitutional rights were not violated by the lack of bifurcation or the lack of an instruction. Accordingly, it cannot be concluded that Gonzalez's trial counsel's actions in not moving to bifurcate or requesting a limiting instruction "fell below an objective standard of reasonableness." <u>Strickland</u>, 466 U.S. at 688. And even if Gonzalez's trial counsel's actions were deficient, Gonzalez fails to meet his burden of proving that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> at 694. Gonzalez's assertions that "it is reasonably probable that this mistake had a negative impact on the defense's case" and that his trial counsel's failures in this regard

1  "seriously prejudiced the defense's case," (ECF No. 32 at 45-46), are conclusory and speculative.

2  See Djerf, 931 F.3d at 881 ("Strickland prejudice is not established by mere speculation.").

3  Therefore, the Nevada Supreme Court's ruling was not contrary to, or an unreasonable application

4  of, clearly established federal law, as determined by the Supreme Court, and was not based on an

5  unreasonable determination of the facts in light of the evidence. 28 U.S.C. § 2254(d). The Court

6  will deny Gonzalez habeas corpus relief with respect to Ground 8d.

7       **5.    Ground 8e**

8       In Ground 8e, Gonzalez claims that his federal constitutional rights were violated when his

9  trial counsel failed to file a motion in limine to exclude bad act evidence.[1] (ECF No. 10 at 37).

10  During Gonzalez's trial, outside the presence of the jury, the State indicated that Gonzalez "was

11  convicted on October 23rd of 2008 of attempt[ed] possession or sale of a document or personal

12  identifying information to establish false status or identity." (ECF No. 15-1 at 5). The State then

13  "ask[ed] that [it] be allowed to bring [the conviction] up if the defendant does, in fact, testify." Id.

14  Gonzalez's trial counsel "object[ed] to allowing them to comment or ask a question regarding [the

15  conviction]." Id. at 6. Gonzalez's trial counsel argued (1) that the facts of Butler v. State, 120 Nev.

16  879, 890-91, 102 P.3d 71, 79-80 (2004) (holding that the State was allowed to impeach a witness

17  with her attempted forgery gross misdemeanor conviction because it "is a crime involving

18  dishonesty and conduct that goes to [her] truthfulness as a witness"), could be distinguished from

19  the facts of Gonzalez's case—in Butler, the State was impeaching a witness and here it would be

20

21  _____

    [1]Gonzalez also asserts that the State's threat of impeachment by his gross misdemeanor conviction
22  persuaded him not to testify. (ECF No. 10 at 37). This argument is belied by the record: at the post-
    conviction evidentiary hearing, Gonzalez answered in the negative when asked if it was true that
23  he was going to testify until he found out that his prior conviction would come into evidence. (ECF
    No. 16-3 at 9).

impeaching the defendant; (2) that the facts of Gonzalez's prior conviction cannot be mentioned; (3) that Gonzalez's prior conviction was a mere attempted possession conviction; and (4) that the prejudicial effect of the conviction outweighed its probative value. (ECF No. 15-1 at 6-7). The facts of Gonzalez's conviction were then explained by his trial counsel:

> [Gonzalez] went and got a – a right to work card in his name to work, and he presented it to the DMV to get his license – that this was wrong. It was an invalid – a fake permission. And in the information it does seem like that [sic] he makes representations to the court and so forth at a sentencing that he got this – this authorization or work card from an alleged attorney for $350, took it there, he thought it was rights and so forth.

Id. at 6-7.

After reasoning that Gonzalez's conviction "related to truthfulness or untruthfulness" and that the conviction was "probative that he was lying to government authority to obtain some benefit," the state district court concluded that the conviction would be allowed to impeach Gonzalez if he testified. Id. at 12. However, the state district court indicated that it would give a limiting instruction regarding the conviction at the time the conviction was brought out during cross-examination as well as in the jury instructions given at the end of the trial. Id. at 12-13. The state district court also indicated that it would not allow an "exploration of the facts" of the conviction; rather, the State would only be able to state the type of conviction, the jurisdiction and the date of the conviction. Id. at 13-14.

Gonzalez argues that his trial counsel was deficient because he should have filed a written motion to preclude the conviction rather than merely objecting at trial. (ECF No. 32 at 50). However, Gonzalez provides no support for this contention that an objection must be made in a specific way. Indeed, "[r]are are the situations in which the wide latitude counsel must have in making tactical decisions will be limited to any one technique or approach." Harrington, 562 U.S.

at 106; see also Strickland, 466 U.S. at 688-89 ("No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant."). Because Gonzalez's trial counsel objected to the admission of the conviction, made various arguments explaining why the State should not be able to cross-examine Gonzalez with the conviction if he testified, and summarized the facts of the convictions (see ECF No. 15-1 at 6-8), it cannot be concluded that Gonzalez's trial counsel's "representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688.

Moreover, because the state district court rightfully allowed the State to impeach Gonzalez with the conviction if he testified, the decision not to file a written motion was not prejudicial. See United States v. Molina, 934 F.2d 1440, 1447 (9th Cir. 1991) ("Because the cocaine was admissible, the decision not to file a motion to suppress it was not prejudicial."); see also Nev. Rev. Stat. § 50.085(3) ("Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's credibility, other than conviction of crime, may not be proved by extrinsic evidence. They may, however, if relevant to truthfulness, be inquired into on cross-examination of the witness or on cross-examination of a witness who testifies to an opinion of his or her character for truthfulness or untruthfulness."); Collman v. State, 116 Nev. 687, 703, 7 P.3d 426, 436 (2000) ("NRS 50.085(3) permits impeaching a witness on cross-examination with questions about specific acts as long as the impeachment pertains to truthfulness or untruthfulness and no extrinsic evidence is used. Impeachment on a collateral matter is not allowed."); Butler, 120 Nev. at 890-91, 102 P.3d at 79-80 (holding that the State was allowed to impeach a witness with her attempted forgery gross misdemeanor conviction). Therefore, the Nevada Supreme Court's ruling was not contrary to, or an unreasonable application of, clearly established federal

1    law, as determined by the Supreme Court, and was not based on an unreasonable determination of

2    the facts in light of the evidence. <u>See</u> 28 U.S.C. § 2254(d). The Court will deny Gonzalez habeas

3    corpus relief with respect to Ground 8e.

4                 **6.**      **Ground 8f**

5          In Ground 8f, Gonzalez claims that his federal constitutional rights were violated when his

6    trial counsel failed to file a motion challenging the voluntariness of his statement. (ECF No. 10 at

7    38). Gonzalez explains that his confession was not voluntary because it was conducted late at night

8    while he was sleep deprived, there were language issues between Gonzalez and the police, and the

9    police used coercive and suggestive tactics. (ECF No. 32 at 54).

10          Detective Brewer interviewed Gonzalez on January 21, 2009, from 2:00 a.m. to 6:33 a.m.

11    at the police station with the assistance of Officer Carmen Torado, who translated the interview

12    into Spanish. (ECF No. 33-2 at 2-3, 101). Detective Brewer read Gonzalez his <u>Miranda</u> rights at

13    the beginning of the interview, and Gonzalez answered in the affirmative when asked whether he

14    understood his rights. <u>Id.</u> at 3. Gonzalez first told the police officers that Ana was attacked by an

15    intruder. <u>Id.</u> at 10-13. Detective Brewer asked Gonzalez if he "want[ed] to stick to that story," and

16    then told him that he was "creating a bigger problem," he was "making a bigger hole," he should

17    "be a man and own up to what happened," there were holes in his story, the police were "going to

18    hit him on every charge . . . possible" if he stuck with that story, and that it would be more difficult

19    if Gonzalez did not "cooperate and . . . tell . . . the truth." <u>Id.</u> at 17, 25-26, 34, 43, 56. Detective

20    Brewer also accused Gonzalez of lying numerous times. <u>Id.</u> at 24, 27, 29, 33, 55, 76, 94, 99.

21    Gonzalez then changed his story and said that Ana stabbed herself. <u>Id.</u> at 58. Again not believing

22    him, Detective Brewer said that he was going to assume that Gonzalez did not "want [to] cooperate

23

with [the] investigation" and that he was "going [to] charge [Gonzalez] with everything because he doesn't wanna [sic] tell [the police] the truth." Id. at 99.[2]

The admission into evidence at trial of an involuntary confession violates a defendant's right to due process under the Fourteenth Amendment. Lego v. Twomey, 404 U.S. 477, 478 (1972); see also Dickerson v. United States, 530 U.S. 428, 444 (2000) (explaining that the requirement that Miranda rights be given prior to a custodial interrogation does not dispense with a due process inquiry into the voluntariness of a confession). "A confession is involuntary if it is not 'the product of a rational intellect and a free will.'" Brown, 644 F.3d at 979 (quoting Medeiros v. Shimoda, 889 F.2d 819, 823 (9th Cir. 1989)). To determine whether a confession was involuntary, a court must consider the totality of the circumstances. See Withrow v. Williams, 507 U.S. 680, 693 (1993); Brown, 644 F.3d at 979. The circumstances the court is to consider include: the element of police coercion; the length, location, and continuity of the interrogation; the defendant's maturity, education, physical condition, and mental health; whether the defendant was advised of his rights; and whether counsel was present. See Withrow, 507 U.S. at 693-94.

First, there does appear to be a basic level of police coercion. Detective Brewer accused Gonzalez of lying and threatened to charge him with everything possible if Gonzalez did not tell the truth. (See ECF No. 33-2 at 17, 24-27, 29, 33-34, 43, 55-56, 76, 94, 99.) Second, the length, location, and continuity of the interrogation were not suspect. The continuous interview lasted approximately four and a half hours at the police station, and it appears that the length of the interview was due to translation requirements. Id. at 2, 101. Next, Gonzalez's age and education level were not concerning: Gonzalez was approximately thirty-two years old at the time of the

_____

[2]It is noted that Gonzalez asked for an attorney during the interrogation; however, the State did not elicit any testimony "related to anything contained in Pages 65 through 100" of the transcribed interrogation, which is the period after Gonzalez asked for an attorney. (ECF No. 15-1 at 3).

interrogation, and he graduated high school in El Salvador. Id. at 4; see also ECF No. 35-1. Regarding his physical condition and mental health, it only appears that Gonzalez was tired at the time of the interrogation. (ECF No. 33-2 at 67-68). Further, although he did not have counsel present, Gonzalez was advised of his rights. See id. at 3. Accordingly, although there were some minor coercive practices utilized by the police, based on the totality of the circumstances, it cannot be determined that Gonzalez's confession was involuntary. Withrow, 507 U.S. at 693.

Because Gonzalez's confession was not involuntary, it was not unreasonable for Gonzalez's trial counsel to have not filed a motion to challenge the confession. See United States v. Molina, 934 F.2d 1440, 1447 (9th Cir. 1991) ("[I]t is not professionally unreasonable to decide not to file a motion so clearly lacking in merit."). Therefore, because Gonzalez's trial counsel's "representation [did not] f[a]ll below an objective standard of reasonableness," Strickland, 466 U.S. at 688, the Nevada Supreme Court's ruling was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, and was not based on an unreasonable determination of the facts in light of the evidence. See 28 U.S.C. § 2254(d). The Court will deny Gonzalez habeas corpus relief with respect to Ground 8f.

**7.   Ground 8g**

In Ground 8g, Gonzalez claims that his federal constitutional rights were violated when his trial counsel failed to file a motion for a psychiatric examination of Ana. (ECF No. 10 at 39). Gonzalez's trial counsel testified at the post-conviction hearing that he was "not aware of any mental health issues" affecting Ana even after running a background check and going through Ana's medical records from the hospital. (ECF No. 16-13 at 17, 19-20). And when asked at the post-conviction evidentiary hearing whether he told his trial counsel about Ana's "mental state or psychological state," Gonzalez did not mention any mental health issues; rather, he only mentioned

that Ana had changed and was supposedly seeing another man. See id. at 7 ("Yeah because that's not the way she was. She just changed in like an instant. She'd been my wife for 12 or 13 years, and then all at once it just changed. I have two children with her. And then I told him that we were getting separated. I wasn't aware, but apparently she wanted to separate from me. I told him that. And supposedly she had been -- she was married to me but she was having relations with somebody else. I wasn't aware.")). It is worth noting that Dr. Browder also testified at Gonzalez's trial that there was no indication that Ana was suicidal. (ECF No. 15-1 at 44).

Although Gonzalez's trial counsel's theory of defense was, in part, that Ana's wounds were self-inflicted (ECF No. 16-13 at 16), there is no evidence to suggest that she had any mental health issues. Further, even if Ana had mental health issues, Gonzalez did not inform his trial counsel of such and his trial counsel testified that he did not have independent knowledge of that alleged information. Accordingly, it cannot be concluded that Gonzalez's trial counsel's actions in not requesting a psychological examination of Ana "fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688. Therefore, the Nevada Supreme Court's ruling was not contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court, and was not based on an unreasonable determination of the facts in light of the evidence. See 28 U.S.C. § 2254(d). The Court will deny Gonzalez habeas corpus relief with respect to Ground 8g.[3]

---

[3]Gonzalez also argues that if this court is not inclined to grant relief on this ground, it should allow him leave to conduct further factual development, including through an evidentiary hearing. (ECF No. 32 at 56). Because this Court has already determined that Gonzalez's trial counsel was not deficient in not requesting a psychological examination because he had no knowledge that Ana had any mental health issues, neither further factual development nor any evidence that would be proffered at an evidentiary hearing—likely a psychologist who would testify that Ana may have had mental health issues—would affect the Court's reasons for denying this ground. Accordingly, there is no good cause to grant these requests.

## IV.    CERTIFICATE OF APPEALABILITY

This is a final order adverse to Gonzalez. Rule 11 of the Rules Governing Section 2254 Cases requires this court issue or deny a certificate of appealability (COA). This court has sua sponte evaluated the remaining claims within the petition for suitability for the issuance of a COA. See 28 U.S.C. § 2253(c); Turner v. Calderon, 281 F.3d 851, 864–65 (9th Cir. 2002). Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000) (citing Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether this court's procedural ruling was correct. Id.

Applying these standards, the court finds that a certificate of appealability is not warranted.

## V.    CONCLUSION

**IT IS THEREFORE ORDERED** that the Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 by a Person in State Custody (ECF No. 10) is **DENIED**.

**IT IS FURTHER ORDERED** that Petitioner is denied a certificate of appealability.

**IT IS FURTHER ORDERED** that the Clerk of the Court is directed to enter judgment accordingly.

DATED: August 26, 2023

_____
RICHARD F. BOULWARE, II
UNITED STATES DISTRICT JUDGE